**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
DIGITAL CAMERA INTERNATIONAL LTD.,
a New Jersey Corporation

Plaintiff,

- against -

BARRY ANTEBI and MARLENE ANTEBI
(f/k/a MARLENE PALACCI)

Defendants.
---------------------------------------------------------X

**REPORT & RECOMMENDATION**

11–CV–01823 (MKB) (RER)

**RAMON E. REYES, JR., U.S.M.J.:**

**TO THE HONORABLE MARGO K. BRODIE,**
**UNITED STATES DISTRICT COURT JUDGE**

Before the Court are the parties' cross-motions for partial summary judgment on the issue of liability. Digital Camera International Ltd. ("DCI") seeks summary judgment against both Barry Antebi ("B. Antebi") and Marlene Antebi ("M. Antebi") for conversion and against B. Antebi only for breach of fiduciary duty. M. Antebi moves for summary judgment on the conversion and unjust enrichment claims against her. On October 9, 2013, the Court referred both motions to the me for a Report and Recommendation. For the reasons that follow, I respectfully recommend that DCI's motion for summary judgment be denied in its entirety and that M. Antebi's motion for summary judgment be granted in part and denied in part.

## BACKGROUND

The following facts are undisputed, unless otherwise noted. DCI is a New Jersey Corporation with its principal place of business in Edison, New Jersey. (DCI's 56.1 ¶ 1; Antebis' Opp'n 56.1 ¶ 1.) The Antebis are married and reside in New York State. (DCI's 56.1 ¶¶ 2, 4; Antebis' Opp'n 56.1 ¶¶ 2, 4.) B. Antebi was Vice President of DCI from October 2007

through April 2011, when DCI terminated his employment. (DCI's 56.1 ¶ 3; Antebis' Opp'n 56.1 ¶ 3.) During his employment, B. Antebi was an authorized user of DCI's business credit card and a signatory on the corporate checking account. (*See* Dkt. No. 51, Exhs. 1 ("DCI's Amex Statements"), 5 ("DCI's PNC Bank Records"); *see also* Dkt. No. 51, Exh. 2 ("1/17/12 B. Antebi Dep.") at 41:3-6, 58:24-59:6.) B. Antebi used the business credit card and issued business checks to pay for personal expenses. (Antebis' Opp'n 56.1 ¶ 5.) He also submitted to DCI for payment charges made on his personal credit card. (*Id.*; *see also* Dkt. No. 51, Exh. 6 ("B. Antebi's Citi Select Statements.") The amount owed by the shareholders for personal expenditures was recorded in a Due To/Due From account. (*See* Dkt. No. 54, Exh. A at ("Trial Balance Records"); Dkt. No. 54, Exh. J ("Aquila Dep.") at 12:14-13:25.) DCI characterizes the Due To/Due From accounts as "simply an accounting system in the event that a personal charge was unavoidable" (Dkt. No. 50 ("DCI's Mem.") at 19) while B. Antebi maintains that "[t]he amount due from any [s]hareholder was treated as a loan . . . to be repaid from company profits" (Dkt. No. 53 ("Antebis' Opp'n Mem.") at 1). In any event, B. Antebi initially agreed to repay DCI the amount of his personal expenditures, but ultimately did not make any payments, arguing that he wanted first to reconcile the amounts due to and from DCI. (1/17/12 B. Antebi Dep. 182:13-183:16; Antebis' Opp'n 56.1 ¶ 9.)

Additionally, while employed at DCI, B. Antebi took steps to create a retail website called Goot to sell consumer electronics in Brazil. (DCI's 56.1 ¶ 9; Antebis' Opp'n 56.1 ¶ 9; 1/17/12 B. Antebi Dep. at 126:6-15, 134:10-14, 141:14-21.) He developed a business plan that contemplated gross sales, salaries, risk, and key competitors. (1/17/12 B. Antebi Dep. at 141:22-

142:8; Dkt. No. 51, Exh. 15 at 13[1].) B. Antebi used the business credit card to pay for domain names for Goot (1/17/12 B. Antebi Dep. at 150:6-10, 155:10-15, 160:14-16; Dkt. No.3 51, Exh. 15 at 1-4) and for airfare to travel to Brazil in furtherance of developing Goot[2] (*see* DCI's Amex Statement at 68; Dkt. No. 51, Exh. 12).

## STANDARD

The party moving for summary judgment has the burden to establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact is one that "might affect the outcome of the suit under the governing law" and that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986). In deciding a summary judgment motion, the court's role "is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000) (citation omitted).

## DISCUSSION

### A. Choice-of-Law

To determine the substantive law that governs a diversity action, courts generally apply the choice of law rules of the forum state, which in this case is New York. *See Am. Fuel Corp. v.*

---

[1] As to citations to certain portions of an exhibit, reference is made to the page number as assigned by the ECF filing system.

[2] At his deposition, B. Antebi testified that he used the proceeds from a business check to pay for attorney's fees incurred in connection with his business venture (1/17/12 B. Antebi Dep. 160:17-161:21), but now claims that he misspoke (Dkt. No. 55 ("B. Antebi Decl.") ¶ 7).

*Utah Energy Dev. Co. Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) (citations omitted). However, "in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." *Walter E. Heller & Co v. Video Innovations Inc.*, 730 F.2d 50, 52 (2d Cir. 1984) (citation omitted). "Such 'conduct' indicating the parties' consent to a given state's substantive law can consist of the cases cited and relied upon by the parties in their briefs, and their apparent decision not to raise the choice-of-law issue." *Schneider v. Canal Ins. Co*, No. 98–CV–5368 (JG), 1999 WL 689476, at *8 (E.D.N.Y. Sept. 1, 1999) (citing *Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 513 (2d Cir. 1993)). The parties' "implied consent" to the laws of a particular jurisdiction "is sufficient to establish choice of law." *Krumme v. Westpoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (citations omitted); *see also Am. Fuel Corp.*, 122 F.3d at 134 ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.") (citation omitted).

Here, the parties' consent, either expressly or impliedly, to the application of New Jersey substantive law. DCI argues that, under New York choice of law rules, New Jersey has the "greatest interest" in regulating B. Antebi's tortious conduct, and as such, New Jersey substantive law governs this dispute. (DCI's Mem. at 10-11.) The Antebis rely on New Jersey case law without a formal choice of law analysis. Consistent with the parties' consent, and unaware of any countervailing public policy, I apply the substantive law of New Jersey.

**B. <u>Conversion</u>**

DCI seeks summary judgment on the conversion claim against the Antebis while M. Antebi seeks dismissal of the conversion claim against her. Under New Jersey law, "[t]he crux of conversion is wrongful exercise of dominion or control over property of another without

authorization and to the exclusion of the owner's rights in that property." *Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 456 (App. Div. 2009) (citation omitted). To establish a conversion claim, the plaintiff must prove "(1) the existence of property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant." *Bridgestone/Firestone North Am. Tire, LLC v. LePore*, No. 05–CV–2830, 2007 WL 4440960, at *7 (D.N.J. Dec. 17, 2007) (citation omitted).

Although developed historically with respect to chattels, courts have applied the tort of conversion to "money, bonds, promissory notes, and other types of securities, as long as the plaintiff has an actual interest in the security and it is capable of misuse in a way that would deprive the plaintiff of its benefit." *Bondi v. Citigroup, Inc.*, 423 N.J. Super. 377, 431 (App. Div. 2011) (citation and quotation marks omitted). However, to differentiate conversion claims from breach of contract claims, "'[it] is essential that the money converted by a tortfeaser belonged to the injured party.'" *Id.* at 432 (quoting *Advanced Enters. Recycling, Inc. v. Bercaw*, 376 N.J. Super. 153, 161 (App. Div. 2005)). Accordingly, the plaintiff must establish that "the money in question was identifiably the plaintiff's property or that the defendant was obligated to segregate such money for the plaintiff's benefit." *Scholes Electric & Commc'n, Inc. v. Fraser*, No. 04–CV–3898 (JAP), 2006 WL 1644920, at *5 (D.N.J. June 14, 2006) (citations omitted). "Where there is no obligation to return the identical money, but only a relationship of a debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor." *Advanced Enters. Recycling, Inc. v. Bercaw*, 376 N.J. Super. at 161-62 (citing 18 Am. Jur. 2d Conversion § 8 (2004)).

1. *Conversion Claim Against B. Antebi*

DCI alleges that B. Antebi converted its property "when [he] diverted funds and assets belonging to [it]" to pay for unauthorized personal expenses.[3] (Dkt. No. 6 ("Am. Compl.") ¶ 66.) DCI contends that it authorized B. Antebi to use the business credit card and checking account "solely for legitimate business expenses" and for select personal expenses, including "health insurance, monthly lease payments on two automobiles, and gas and toll expenses for one vehicle." (DCI's Mem. at 5.) To establish the parties' mutual understanding in this regard, DCI points to B. Antebi's purported admission that he stole from DCI[4] and to his unfulfilled promises

---

[3] The parties assume that credit card transactions can serve as the predicate for a conversion claim, at least as against B. Antebi. (*See* Antebis' Opp'n Mem. at 25 (arguing, without discussion, that credit card charges cannot be the basis for conversion claim against M. Antebi).) In our modern economy, "[t]he appropriate scope of a conversion action as applied to intangible personal property has been the subject of scholarly and informative discussion," *Welco Elecs., Inc.* v. *Mora*, 223 166 Cal. Rptr. 3d 877, 877 (2014) (collecting materials)), and poses a puzzling question for courts. *Compare Welco Elecs., Inc. v. Moral*, 223 166 Cal. Rptr. 3d at 877 (concluding that a conversion claim may lie where defendant allegedly took plaintiff's property right to the balance in its credit card account); *Pfeiffer v. Wulster*, No. 09–13388 (MBK), 2011 WL 1045355, at *5 (Bankr. D.N.J. March 7, 2011) (finding conversion of funds from plaintiff's credit line since "[i]t is without question" that credit cards are property), *aff'd*, 2012 WL 589564 *with Scott v. Rosenthal*, No. 97–CV–2143 (LLS), 2000 WL 1863452, at *10 (S.D.N.Y. Dec. 20, 2000) (denying conversion claim for unauthorized credit card purchases which do no more than give rise to a debt to third parties). Should the Antebis seek to pursue their argument that credit card transactions are "not money, bonds, promissory notes, or other types of securities" subject to conversion, *Bondi v. Citigroup*, 423 N.J.Super. at 432, I recommend that the Court require further briefing on this issue, to assist it in predicting how New Jersey courts would rule on this ever-evolving area of the law. *See* RESTATEMENT (SECOND) OF TORTS § 242 cmt. f (2013) ("The process of extension [of the law of conversion] has not, however, necessarily terminated; and nothing that is said in this Section is intended to indicate that in a proper case liability for intentional interference with some other kind of intangible rights may not be found.").

[4] According to DCI, Barry confirmed at his deposition that he admitted to stealing from DCI during a conversation with Ely Eddi ("Eddi") and Danny Bergman ("Bergman"). (DCI's Mem. at 17-18.) To the contrary, Barry testified that he did not remember his exact words during the subject conversation, as he was "scared," "intimidated," and on medication, but acknowledged that he made statements expressing remorse for his conduct, and promised to repay the money.

to repay the money. (1/17/12 B. Antebi Dep. at 183:3-4.) Additionally, DCI relies on B. Antebi's testimony that he would not be entitled to take money for expenses "[o]her than the cars and the health insurance and the gas and tolls" if DCI had no profits. (1/17/12 B. Antebi Dep. at 181:25-182:5; *see also id.* at 174:20-24 (acknowledging that ability to make charges and draw checks conditioned on profits). To that end, DCI contends that it operated at a loss from 2009 through 2011, and that none of the other shareholders received their profit share. (DCI's Mem. at 20.)

For his part, B. Antebi contends that "[t]here was never an agreement" regarding use of the business credit card, but "if [he] charged something personal it went into [his] personal account." (1/17/12 B. Antebi Dep. at 41:12-14.) B. Antebi testified that he would designate charges on credit card statements as business or personal purchases (*Id.* at 44:14-20, 45:9-10) and provided copies of credit card statements to DCI showing such designations (Dkt. No. 60, Exh. C). He attests that DCI would record the amount of his personal expenditures in his Due To/Due From account, as corroborated by the deposition testimony of a DCI employee. (*See* Aquila Dep. at 12:14-13-25 ) B. Antebi avers that the amount in his Due To/Due From account "would go against [his] share" of profits (1/17/12 Antebi Dep. at 42:17-23), and in this way, his personal expenditures "were booked as a loan to him to be paid out of the company profits." (Antebis' Opp'n Mem. at 4.) In support of his position, B. Antebi relies on the deposition testimony of David Raanan ("Raanan"), a shareholder of DCI, who described the practice as "more like a loan

---

(Dkt. No. 51, Exh. 3 ("11/14/12 B. Antebi Dep.") at 45:21-49:19.) That said, Barry does not appear to dispute that he admitted to stealing from DCI, but challenges the meaning of his statements. (Antebis' Opp'n Mem. at 15.)

that [DCI] would front [him] and then whenever asked upon [he'd] pay it back." (Dkt. No. 54, Exh. K ("Raanan Dep.") at 25:4-6.)

The deposition testimony and documentary evidence give rise to a genuine factual dispute concerning whether DCI authorized B. Antebi to use the business accounts to pay for personal expenditures. Although DCI contends that "it cannot be stressed enough" that B. Antebi admitted to stealing during an audio recorded conversion with the other shareholders (Dkt. No. DCI's Reply. at 6), I do not find that his after-the-fact "admissions" resolve the factual dispute concerning his allegedly wrongful conduct. B. Antebi challenges the meaning of his statements in context (Antebis' Opp'n Mem. at 15) and testified that he was "scared," "intimidated," and on medication during the subject meeting (11/14/12 B. Antebi Dep. at 46:17-20, 47:25-48:2). Moreover, his so-called "admission" does not establish the parties' mutual understanding at the time that DCI provided B. Antebi with the business credit card.

DCI also relies on B. Antebi's post-suit acknowledgment that "profits" operated as a theoretical precondition to his authority to make personal expenditures. DCI contends that it operated at a loss from 2009 through 2011. (DCI's Mem. at 20.) But DCI provides no affidavits from the other shareholders concerning profit distribution during these relevant years. Nor does it provide sufficient evidence concerning its finances or any evidence at all that B. Antebi was aware of the financial condition of the company. Furthermore, evidence in the record tends to show that other shareholders did not tailor their use of the business credit based on the purportedly low profits from 2009 through 2011. For example, financial records show an increasing balance in the Due To/Due From accounts of both B. Antebi and Raanan during that

time frame. (*See* Trial Balance Records.[5]) Given competing evidence in the record, a rational juror could find for either party as to the issue of whether B. Antebi acted without authorization, precluding summary judgment on the conversion claim against B. Antebi.[6]

2. *Conversion Claim Against M. Antebi*

DCI seeks summary judgment against M. Antebi for conversion based on evidence that she benefitted from certain purchases made by B. Antebi and that she physically used the business credit card to pay for personal expenses. M. Antebi seeks summary judgment on the conversion claim against her, arguing that B. Antebi was authorized to make the personal charges that purportedly benefitted her, and that the evidence does not establish that she herself used the business credit card. (Dkt. No. 58, Exh. 3 ("M. Antebi's Mem.") at 4.)

Inasmuch as DCI argues that M. Antebi "benefitted and was enriched as a result of her husband's thievery" (DCI's Reply. Mem. at 11), it's conversion claim against M. Antebi is

[5] Although the Trial Balance Records arguably show a loss from 2009 through 2011, I do not presume that such records adequately represent the overall financial health of DCI, particularly as profitability is a highly fluid concept.

[6] Having concluded that a factual dispute precludes summary judgment on the conversion claim, I do not address B. Antebi's affirmative defenses of waiver and recoupment/offset, except to note factual disputes material to a waiver defense. "A waiver must be accomplished by a 'clear unequivocal and decisive act," and "[t]he circumstances must show clearly that while the party knew of the right, he or she abandoned the right either by design or indifference." *Borough of Closter v. Abram Demaree Homestead, Inc.*, 365 N.J. Super. 338, 354 (App.Div.2010) (citations omitted). Here, Barry argues that DCI waived its right to bring a conversion claim by "allowing" him to make personal expenditures over a four year term. (DCI's Opp'n Mem. at 22.) The parties dispute concerning the nature and extent of authority granted to Barry by DCI to use the business accounts underpin a waiver defense. Additionally, a genuine dispute exists as to when DCI knew of Barry's alleged wrongful conduct. (*Compare* Dkt. No. 54, Exh. G ("Moses Dep.") at 45:8-21 (financial personnel testifying to awareness of personal expenditures since 2008) *with* Dkt. No. 54, Exh. H ("Eddi Dep.") at 59:4-8 (shareholder indicating that he became aware of balance in Due To/Due From account in 2010).)

sufficient to withstand dismissal. But a material factual dispute precludes entry of summary judgment in DCI's favor.

Under New Jersey law, a plaintiff has a valid conversion claim against "allegedly innocent recipients of plaintiff's fraudulently obtained money if defendants gave no fair value in exchange for the money." *Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. at 463. Although I am unaware of any New Jersey case on point, it appears that New Jersey courts would apply this rule even assuming the innocent recipient never exercised dominion or control over the money, but nonetheless benefitted from items purchased with the converted funds. The court in *Chicago Title* found guidance in the Fourth Circuit's decision in *Federal Ins. Co. v. Smith*, 63 Fed. Appx. 630 (4th Cir. 2003). The Fourth Circuit affirmed a judgment of conversion under Virginia law against a wife who had received funds that her husband obtained by fraud. *Id.* at 635. Although admittedly a "more difficult analysis," the Fourth Circuit found no distinction between "the presence or actual physical control over the funds" that were used to pay off creditors to which she and her husband were jointly and severally liable, since by sending the checks her husband "was doing only what [defendant] expected of him and knew he would be doing on his behalf." *Id.* Additionally, the Fourth Circuit found that "the fact that the funds were in the form of credit at this stage and no longer cash is of no matter." *Id.*

By this reasoning, M. Antebi could be liable for conversion even if she did not personally use the business credit card. Although M. Antebi disputes that she benefitted from certain charges attributed to her (*see* Dkt. No. 54, Exh. B), the undisputed evidence reflects that B. Antebi used the business credit card to purchase airfare on his wife's behalf (1/17/12 B. Antebi Dep. at 85:8-10, 86:21-87:5), thus transferring the alleged converted funds to her in changed

form. Additionally, given the nature of certain charges, and B. Antebi's admissions that he used the business accounts to pay his income taxes and to finance his children's school tuition and camp expenses (Dkt. No. 55 ("B. Antebi Decl.") ¶ 3), a rational fact finder could conclude that B. Antebi used the business credit card to satisfy obligations for which he and M. Antebi were jointly responsible. Although M. Antebi argues that she gave fair value in exchange for the money as B. Antebi's wife, thereby establishing a stronger property interest in DCI's funds, she does not elaborate on what that means or provide any legal authority in support of her position. Accordingly, DCI states a valid claim for conversion against M. Antebi, and her request for summary judgment should be denied.

Nevertheless, the factual dispute concerning the extent of B. Antebi's authority to use the business credit card, as discussed above, precludes summary judgment on the conversion claim against M. Antebi. As DCI acknowledges, "a claim of conversion against [M Antebi] will not lie if [B. Antebi] is not also liable for conversion." (DCI's Reply Mem. at 11.) Put plainly, DCI cannot hold M. Antebi liable for receiving "fraudulently obtained money," in whatever form, if a fact finder concludes that B. Antebi's conduct was authorized. Relatedly, even if M. Antebi personally used the business credit card, a factual allegation squarely refuted by both defendants, the propriety of her use derives from the authority granted to B. Antebi by DCI. Given these material factual disputes, DCI's motion for summary judgment on the conversion claim against M. Antebi should be denied.

### C. Unjust Enrichment

M. Antebi seeks summary judgment on DCI's claim of unjust enrichment against her. To establish unjust enrichment under New Jersey law, the plaintiff must demonstrate "that defendant

received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994) (citations omitted). Although quasi-contracts arise under factually diverse circumstances, New Jersey courts have recognized a "common thread runs throughout," inasmuch as the plaintiff "expected remuneration from the defendant, or if the true facts were known to plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred." *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 334-35 (App. Div. 1996) (citation omitted). Further, "quasi-contract cases involve either some direct relationship between the parties or a mistake on the part of the person conferring the benefit." *Id.* at 335.

As an initial matter, DCI fails to state a facially plausible unjust enrichment claim against M. Antebi, since the conduct underlying its claim sounds in tort. New Jersey law does not recognize unjust enrichment as an independent tort cause of action. *Swift v. Pandey*, No. 13–CV–649 (JLL), 2013 WL 6022093, at *6 (D.N.J. Nov. 13, 2013) (citations omitted); *see Castro v. NYT Television,* 370 N.J. Super. 282, 299 (App. Div. 2004) ("[T]he role of unjust enrichment in the law of torts is limited for the most part to its use as a justification for other torts such as fraud or conversion." (citing RESTATEMENT (FIRST) OF RESTITUTION I.7 Intro. Note (1937)).

Moreover, the relationship between DCI and M. Antebi is too attenuated to sustain an unjust enrichment claim. DCI offers no evidence that it maintained "some direct relationship" with M. Antebi. Nor has DCI shown that it conferred a benefit to M. Antebi under a quasi-contract relationship with the expectation of remuneration from her, as opposed to B. Antebi. *See Swift v. Pandey*, 2013 WL 6022093 at *6 (dismissing unjust enrichment claims based on

allegations of misappropriation of company assets to friends and family, including some named defendants); *Cafaro v. HMC*, 07–CV–2793 (JLL), 2008 WL 4224805, at *7 (D.N.J. Sept. 8, 2008) (dismissing unjust enrichment claim brought by investor against fund manager's wife who allegedly received portions of husband's estate for purposes of insulating assets from lawsuits). Indeed, it appears that DCI did not expect repayment from M. Antebi even after it discovered the extent of B. Antebi's expenditures, as Eddi testified that prior to bringing the instant lawsuit the shareholders "gave Barry several weeks to . . . pay back the company for what he owed." (Eddi Dep. at 43:3-5.)

As DCI's unjust enrichment claim fails as a matter of law, the Court should grant M. Antebi's motion for summary judgment in this respect, and dismiss the unjust enrichment claim against her.

**D. Breach of Fiduciary Duty**

DCI seeks summary judgment on the breach of fiduciary duty against B. Antebi. An employee "owes a duty of loyalty to the employer, and the employee must not, while employed, act contrary to the employer's interests." *Auxton Computer Enters., Inc. v. Parker*, 174 N.J. Super. 418, 425 (App. Div. 1980). This duty does not, however, preclude an employee from taking actions to secure some future employment opportunity. *See Lamorte Burns & Co. v. Walters*, 167 N. J. 285, 304 (2001) ("[A]lthough an employee has the right to make preparations to start a competing business, the employee may not breach the undivided duty of loyalty he or she owes to his or her employer . . . .") (citations omitted). Employees occupying a position of trust and confidence, for example, owe a higher duty than those performing low-level tasks. *Id.*

Courts have found that assisting an employer's competitor and engaging in self-dealing can constitute a breach of the employee's duty of loyalty. *Id.*

DCI contends that B. Antebi breached his fiduciary duty by endeavoring to create Goot, a competing online consumer electronics business, while still employed at DCI. Further, DCI points to evidence in the record showing that Antebi used corporate funds to finance Goot's development stages, including the purchase of internet domain addresses and airplane tickets. B. Antebi maintains that the venture was not in direct competition since Goot intended to focus on retail electronics in Brazil, whereas DCI dealt in the wholesale electronics business in New Jersey. Additionally, B. Antebi asserts that the parties never signed a non-compete agreement, and moreover, that the venture never materialized.

The existence of a non-compete agreement or the eventual fate of Goot is immaterial here. If Antebi was, as DCI contends, diverting company funds to finance a competing venture, he would have been acting adversely to DCI's interest. But the evidence establishes that Goot was never intended to compete with DCI. DCI was a wholesaler while Goot was intended to be an online direct seller to Brazilian clientele. DCI had no interest in engaging in direct sales to end users in any market, let alone a Brazilian one. (*See* Eddi Dep. at 106:4-108:12.)

DCI attempts to reframe the issue by suggesting that the fiduciary breach stems not from the fact that Goot would have competed against DCI, but "the fact that Barry Antebi wrongfully, improperly, and surreptitiously took these steps while he was an officer and employee of DCI and was being paid a salary by DCI." (DCI's Reply. Mem. at 3.) Nevermind that B. Antebi was not acting surreptitiously at all, since he overtly solicited the involvement of Eddi (Eddi Dep. at 106:4-108:12), there is nothing wrong or improper about preparing for future employment while

working for someone else. *See Auxton*, 174 N.J. Super. at 425 ("Equally clear is the proposition that the employee is entitled to make 'arrangements' for some new employment by a competitor and should be given some latitude in this regard."). Indeed, even had B. Antebi been surreptitious in his efforts to fund Goot, or conducted Goot business on company time, such conduct would "not reach that level of impropriety which has heretofore been required when imposing liability for violating the duty of loyalty owed to an employer." *Id*.

Nevertheless, to the extent that B. Antebi was *wrongfully* diverting DCI assets in furtherance of developing Goot, a rational fact finder could find that he breached his duty of loyalty to DCI. This analysis, like the analyses above, hinges on the extent and nature of authority that B. Antebi had to use the business credit card. Because a genuine issue of fact remains as to the scope of the authority granted by DCI to B. Antebi, DCI's motion for summary judgment on the fiduciary breach claim against B. Antebi should be denied.

**CONCLUSION**

Based on all of the foregoing, I respectfully recommend that DCI's motion for summary judgment be denied in its entirety and that Marlene Antebi's motion for summary judgment be granted in part and denied in part.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court and the Honorable Margo K. Brodie within fourteen days of receipt hereof. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72; *Small v. Sec'y of Health & Human Servs*., 892 F.2d 15, 16 (2d Cir. 1989).

Dated: February 21, 2014
Brooklyn, New York

*Ramon E. Reyes Jr.*
**Ramon E. Reyes, Jr.**
**United States Magistrate Judge**