UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
DIGITAL CAMERA INTERNATIONAL,
LTD., A NEW JERSEY CORPORATION

      Plaintiff,      11 CV 1823 (SJ)
 v.           DECISION AND ORDER

BARRY ANTEBI and MARLENE
ANTEBI,
      Defendants.

---------------------------------------------------X

**JOHNSON, U.S.D.J.:**

  Plaintiff Digital Camera International ("DCI") sued Defendant Barry Antebi ("Mr. Antebi") for breach of fiduciary duty, conversion, fraud, constructive trust, unjust enrichment, and accounting. DCI also sued Mrs. Marlene Antebi for conversion. Mr. Antebi counter-sued for minority shareholder oppression. Based on the evidence at trial, the findings of fact, the post-trial briefings, and for the reasons listed below, both parties failed to establish any of their claims.[1]

I.  **BACKGROUND**

  Ely Eddi, Mr. Antebi, and others started DCI, a New Jersey corporation, which sold cameras and other electronics primarily to retailers. Mr. Eddi owns

---

[1] The undersigned dismissed the complaint against Mrs. Antebi since DCI had not shown that she actually received any of the converted funds. (Tr. at 245). This Court now holds that since Mr. Antebi did not convert any funds, Mrs. Antebi could not have derivatively converted those funds.

1

23.34%, Danny Bergman owns 33.3%, David Raanan owns 10%, and Mr. Antebi, who was in charge of day-to-day operations, owns 33%. (Trial Transcript ("Tr.") at 25). The business was in operation from late-2007 until 2011. For reasons still unclear, Mr. Antebi and Mr. Eddi had a falling out which led to Mr. Antebi's removal as an officer. DCI claims Mr. Antebi was forced out for bilking DCI. Mr. Antebi claims he was forced out through shareholder oppression.

II. FINDINGS OF FACT

1. Mr. Eddi was responsible for overseeing DCI. (Tr. at 26).

2. Mr. Eddi and Mr. Bergman also operated another all-too-related company, Digital Data Devices ("DDD"). (Tr. at 17-18).

3. DDD would loan DCI money. (Tr. at 259). DCI's credit cards were under DDD's account. (Tr. at 329).

4. Robert Moses acted as comptroller for both DCI and DDD. (Tr. at 123).

5. Shortly after DCI was created, Mr. Moses developed a due-to/due-from account system to keep track of personal purchases made by shareholders using company charge cards and accounts. (Tr. at 200-01).

6. Beginning in 2007 and continuing until his termination, Mr. Antebi used corporate charge cards and accounts to make personal purchases with the full knowledge of Mr. Moses and Mr. Eddi. (Tr. at 30, 201).

7. Other shareholders also used corporate accounts to make personal purchases.

2

8. Each shareholder (and the comptroller) understood that personal purchases would be charged to each shareholder's respective due-to/due-from accounts to be repaid out of that shareholder's share of corporate profits.

9. To facilitate such repayment and proper accounting, shareholders were to identify personal purchases and corporate expenses on the credit card bills.

10. Despite those identifications, DCI was never reimbursed. As of trial, shareholders had still not repaid DCI from profits or otherwise. (Tr. at 194).

11. Mr. Antebi mislabeled some charges as corporate that should have been labeled as personal.

12. But neither Mr. Eddi nor Mr. Moses could say with certainty which charges were mislabeled, let alone *purposely* mislabeled by Mr. Antebi.

13. Mr. Moses, at Mr. Eddi's direction, changed a number of charges that Mr. Antebi marked as corporate expenses to personal purchases.

14. Mr. Moses had no personal knowledge of any of Mr. Antebi's charges and depended wholly on Mr. Eddi's characterizations. (Tr. at 164)

15. But Mr. Eddi could not guarantee that his characterizations of the charges were correct. (Tr. at 40-41)

16. Mr. Antebi admits that he owes DCI for his personal purchases. He even admitted that he misidentified some personal charges as corporate and some corporate charges as personal. (Tr. at 277-83; Defendant's Ex. EE).

3

17. However, Mr. Antebi could not prove which charges he mistakenly labeled as personal other than to conclusorily say as much. (Defendant's Ex. EE).

18. Mr. Antebi purchased Yankees ticket packages using DCI funds. The tickets were eventually billed to his due-to/due-from account as personal purchases.

19. Mr. Antebi sold his tickets for games that he could not attend, keeping the proceeds of each sale. (Tr. at 296).

20. Despite listing the tickets as personal purchases, Mr. Eddi, Mr. Moses, and their tax accountant agreed to list the tickets as corporate expenses on tax returns so DCI could also use it as a tax deduction. (Tr. at 202).

21. Separately, Mr. Antebi developed an idea to sell electronics in Brazil via the internet under the umbrella of a new entity, Goot.

22. DCI did no business in Brazil and had no customers there. (Tr. at 166).

23. Goot did not compete with DCI and never solicited DCI customers.

24. Before acting on the Goot opportunity, Mr. Antebi presented it to Mr. Eddi who rejected it on behalf of DCI but offered his approval for Mr. Antebi to pursue the opportunity on his own. Goot never came to fruition. (Tr. at 329).

25. Mr. Antebi also used DCI assets to fund an extra-marital affair, splurging on luxury cars and international trips, among other purchases for his mistress.

26. Mr. Antebi also paid his personal tax obligations with DCI assets. Mr. Antebi did this with DCI's full knowledge. Mr. Eddi even signed one of the checks to the New Jersey Tax Authority on Mr. Antebi's behalf. (Tr. at 255-56).

P-049

27. DCI rented office and warehouse space from DDD at an incredibly inflated price. At one point, the rent was $84,000 for space that was worth less than $5000. (Tr. at 208, 217-28). The two companies also shared staff for which DDD charged DCI inflated administrative services costs. (Tr. 208, 217-28; Defendant Ex. I, at 2).

28. Mr. Moses said the rent price was inflated because it included administrative services, insurance, and even workers compensation. (Tr. at 210). However, balance statements show that administrative services, insurance, and workers compensation were not included in rent. (Defendant's Ex. I., at 2-3).

29. Mr. Antebi knew about the inflated rent and administrative fees from the beginning. (Tr. at 228)

30. Mr. Antebi and Mr. Eddi both made self-serving charitable donations using DCI assets with the full knowledge of the other. It remains unclear if any of those donations were actually donations at all.

III. CONCLUSIONS OF LAW

1. Choice of Law

A federal court sitting in diversity applies the choice of law rules of the forum state. Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989). Accordingly, New York's choice of law rules apply to this case.

5

Under New York's choice of law rules, the laws of the jurisdiction having the greatest interest in the litigation apply. See GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 384 (2d Cir. 2006) (quoting Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 197 (1985)). The jurisdiction with the greatest interest is generally the jurisdiction where the tort occurred. See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 158 (2d Cir. 2012).

Each of the instant claims and counter-claims concern conduct which occurred in New Jersey, where DCI was located. As such, New Jersey law applies.

2. Fiduciary Duty

To prove a breach of fiduciary duty, the plaintiff must prove: (1) the existence of a fiduciary relationship; (2) the breach of a duty imposed by that relationship; and (3) harm. Inventory Recovery Corp. v. Gabriel, No. 2:11-CV-01604, 2012 WL 2990693, at *4 (D.N.J. July 20, 2012) (citing McKelvey v. Pierce, 173 N.J. 26, 57 (2002)). A fiduciary relationship exists when "one party places trust and confidence in another who is in a dominant or superior position." McKelvey, 173 N.J. at 57. Such a relationship imposes a duty of loyalty upon the fiduciary. Id. (citing Restatement (Second) of Torts § 874 (1979)). The duty of loyalty is breached when the fiduciary acts against the employer's interest. See Lamorte Burns & Co. v. Walters, 167 N.J. 285, 302 (2001).

A fiduciary violates no duty to his employer by acting for his own benefit if he makes a full disclosure of the facts to an acquiescent employer and takes no unfair advantage of him. Restatement (Second) of Agency § 390, Cmt. a). A fiduciary may even arrange to start a competing business as long as he does not engage in secret competition or solicit the employer's customers. Lamorte, 167 N.J. at 303. Disgorgement of compensation may be a remedy. See Kaye v. Rosefielde, 223 N.J. 218, 222 (2015). But such disgorgement is limited to the compensation received during pay periods in which the fiduciary acted disloyally. Id.

In the instant case, there are various alleged breaches of the duty of loyalty. However, none survives the fires of close examination. As a threshold matter, Mr. Antebi was a fiduciary for DCI. As a one-third shareholder running day-to-day operations, DCI invested great confidence and trust in him. See McKelvey, 173 N.J. at 57. As such, Mr. Antebi owed DCI a duty of loyalty.

Using Company Assets for Personal Gain

Mr. Eddi testified that he knew of Mr. Antebi's use of company assets for personal gain in early 2008 – just a few months after DCI was started. (Tr. at 30-31). Rather than immediately demand repayment, disgorgement, or termination, Mr. Eddi and Mr. Moses set up DCI's due-to/due-from system for the express purpose of allowing employees, including Mr. Antebi, to use company credit cards and accounts to make personal purchases. (Tr. at 31, 74-75, 134, 200, 203). Therefore, DCI

ratified the practice as opposed to proscribing the behavior. See Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 177, (2011) (finding that when corporate actions have been approved or ratified, the propriety of those actions are to be presumed correct). In any event, having knowingly allowed Mr. Antebi to use the due-to/due-from system to make personal purchases using DCI assets for more than 4 years, DCI cannot now complain about its use after falling out with Mr. Antebi. See Fox v. Millman, 210 N.J. 401, 417 (2012) (precluding relief under the doctrine of laches when there is an "unexplainable and inexcusable delay" in exercising a right).

Personal Tax Obligations

One would think that even if personal purchases were permitted, surely paying personal tax burdens with company money would be impermissible. But at DCI, that would be incorrect. Mr. Eddi, himself, the overlord of DCI, signed a DCI check to pay for Mr. Antebi's personal tax obligations to New Jersey Tax Authority. Aside from implying the underreporting of Mr. Antebi's income, Mr. Eddi's signature substantiates Mr. Antebi's claim that Mr. Eddi knew about the payment of personal tax obligations with DCI assets. Having permitted this practice, DCI is precluded from now calling it a breach of the duty of loyalty. See Seidman, 205 N.J. at 177; Fox, 210 N.J. at 417.

P-049

Goot

Next, DCI claims Mr. Antebi's acts in furtherance of Goot constituted a breach of the duty of loyalty. But this argument fails for a few reasons. First, Goot was not a competing business. DCI admits that Goot was established to "sell electronic merchandise via the internet, to end users in Brazil." (Dkt. No. 65, at 13). DCI does no business in Brazil, does not allege that Goot sold the same products, and generally does not sell to end users. (Tr. at 166). DCI's claim seems to rest on the fact that Mr. Antebi was attempting to get involved in *any* business. Yet, DCI had no problem with Mr. Eddi and others operating DDD – an entity that actually sold electronics.

Second, since Goot was not a competing business, DCI needed to show that Mr. Antebi (a) worked on Goot during DCI time; or (b) used DCI assets for Goot. No testimony established formal working hours for Mr. Antebi. Therefore, no evidence suggests that he should have been working on DCI work at any specific time during the day but was instead working on Goot. The absence of such evidence is fatal to any request for disgorgement of compensation. See Kaye, 223 N.J. at 222.

DCI alleged that Mr. Antebi's trial attorney, Frederick Biehl, was paid, using DCI money, to assist with the formation of Goot. However, DCI could not muster so much as a line item on a financial report, much less a check or record of transfer to Mr. Biehl. In any event, even if Mr. Antebi had paid for legal services to assist

9

his personal endeavors, there would be no harm since employees of DCI were authorized to use company assets for personal purchases.

Finally, and perhaps most importantly, Mr. Antebi, presented the business plan for Goot to DCI before taking a single step toward establishing the entity. (Defendant's Exhibit LL, at 111). According to Mr. Eddi, he "expressly rejected" the idea on behalf of DCI. By presenting the idea to DCI and waiting for DCI to reject it first, Mr. Antebi satisfied his duty as a fiduciary. See Alper v. Simon, No. A-2016-11T4, 2014 WL 2864998, at *21 (N.J. Super. Ct. App. Div. June 25, 2014) (There is no diversion of a corporate opportunity claim if the defendant presented the corporation with the business opportunity and the corporation rejected it).

Yankees Ticket

The use of DCI assets for personal purchases was fair game. As such, Mr. Antebi's purchase of Yankees tickets for personal use with company cards and accounts did not breach any duty.[2]

DCI seeks disgorgement of the proceeds Mr. Antebi received from his sale of the tickets on StubHub. However, if the tickets constituted a personal purchase, as argued by DCI, then they were Mr. Antebi's property to dispose of as he pleased.

---

[2] Ironically, despite charging the tickets to Mr. Antebi's due-to/due-from account (necessarily admitting that the tickets constituted a personal purchase), DCI still sought to list the tickets as a tax-deductible company expense. (Tr. at 202). This means DCI sought a tax deduction *and* a reimbursement from Mr. Antebi for the *same expenditure.*

The sale of tickets by their owner could not establish a usurpation of a corporate opportunity, especially since selling sports tickets is not "in the line of [DCI's] business." See Alper, No. A-2016-11T4, 2014 WL 2864998, at *21.

DCI has failed to establish any claim for breach of a fiduciary duty. As such this Court finds for Mr. Antebi on the fiduciary duty claims.

3. Conversion

Under New Jersey law, conversion is the intentional exercise of dominion or control over personal property that seriously interferes with the right of another to control it. See Mueller v. Tech. Devices Corp., 8 N.J. 201, 207 (1951); see also Restatement (Second) of Torts § 222A(1). "The essence of a conversion claim is that one party exercises the right of ownership over property belonging to another *without that person's permission.*" Pollen v. Comer, No. 05-CV-1656-JBS, 2007 WL 1876489, at *11 (D.N.J. June 27, 2007) (emphasis added). There can be no conversion where the plaintiff consented to the interference. See Sovereign Bank v. United Nat'l Bank, 359 N.J. Super. 534, 538 (App. Div. 2003); see also Restatement (Second) of Torts § 252. Likewise, where the owner of the property expressly ratifies the conversion, he cannot recover for conversion of that property.

P-049

### Personal expenses on corporate accounts

Plaintiff claims Mr. Antebi converted DCI assets by using company cards and accounts to pay for personal expenses. As explained, supra §III(2), each shareholder was permitted to make unfettered personal purchases using company assets. (Tr. at 74-75, 134, 200, 203). In other words, DCI consented to Mr. Antebi's interference with its rights thereby negating any conversion claim. Pollen, No. 05-CV-1656-JBS, 2007 WL 1876489, at *11; Sovereign Bank, 359 N.J. Super. at 538.

### StubHub Sales

As established, supra §III(2), Mr. Antebi owned the Yankees tickets. Conversion requires dominion over *someone else's* property. See Mueller, 8 N.J. at 207 (emphasis added). He could not have converted the proceeds of the sale of property he owned.[3] This Court finds for Mr. Antebi on the claim of conversion.

4.  Fraud

Fraud requires (1) a material misrepresentation of fact (2) knowledge or belief of its falsity (3) intention of inducing reliance (4) reasonable reliance and (5) damages. See Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. 619, 624 (1981).

---

[3] Under oath, Mr. Antebi admitted that he did not report the more than $30,000 worth of income from the sale of these tickets to the IRS or the New Jersey Tax Authority. (Tr. at 306).

P-049

DCI claims it reasonably relied on Mr. Antebi's allegedly purposeful misidentification of personal purchases to its detriment. But DCI offered no reliable evidence of any misidentifications, let alone *purposeful* misidentifications. Given a list of purchases that included Costco, various gas stations, restaurants, and fashion designers, Mr. Eddi admitted that he could not guarantee that the items were not corporate in nature. (Tr. at 40). In other words, he could not say for sure they were misidentified. There was talk of confusing letters – b's (for business) that looked like p's (for personal) and vice versa. But DCI offered no credible evidence suggesting the confusion was purposeful.

To be sure, this Court seriously doubts that Mr. Antebi truthfully identified every purchase. But it was DCI's burden to identify those incidents where the identification was wrong and to prove Mr. Antebi knew or believed it was wrong. DCI failed. Therefore, this Court finds for Mr. Antebi on the fraud claim.

5. Constructive Trust

To assert a constructive trust, a plaintiff must establish that a wrongful act occurred which resulted in a transfer of property that would create an unjust enrichment if the defendant were allowed to keep that property. See D'Ippolito v. Castoro, 51 N.J. 584, 588-89 (1968). In the instant case, DCI failed to establish any wrongful act. Therefore, a constructive trust request fails.

P-049

### 6. Unjust Enrichment

Unjust enrichment requires that plaintiff show that it expected remuneration from the defendant. See VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994). Where that expectation is present and reasonable, New Jersey law raises a quasi-contractual obligation on the part of the defendant to remunerate plaintiff. See St. Paul Fire & Marine Ins. Co., v. Indem. Ins. Co. of N. Am., 32 N.J. 17, 22 (1960). But a quasi-contract is unnecessary where an actual binding agreement exists.

DCI reasonably expected Mr. Antebi to repay the money spent on personal expenses. The very existence of the due-to/due-from account establishes this fact. Mr. Antebi knew that he was supposed to repay DCI. (Tr. at 252). Put differently, the parties agreed, however implicitly, that Mr. Antebi could use DCI assets if he paid DCI back later. That agreement created a binding contract. See N.J.S.A. § 12A:1-303(a). It *would* amount to unjust enrichment if Mr. Antebi could keep the benefit of all of the personal expenses without compensating DCI. But since Mr. Antebi agrees that he is obligated to repay DCI, there is no need for this Court to impose a quasi-contractual obligation. Mr. Antebi owes DCI and he knows it.

But there is a major problem in figuring out *how much* Mr. Antebi actually owes DCI. At very least, all of the expenses that Mr. Antebi admits were personal expenses must be repaid. But DCI was wholly unable to carry its burden in establishing what expenses should have been listed as personal expenses.

P-049

Mr. Moses testified that he had no personal knowledge of what was personal versus what was corporate. (Tr. at 164). He said that he went off what Mr. Eddi told him. (Tr. at 159). But at trial, Mr. Eddi testified that he could not guarantee that all the items he identified as personal were in fact personal. (Tr. at 40-41, 76-77). DCI's inability to establish which items were personal as opposed to corporate expenses will not result in this Court guessing blindly. It was DCI's burden to establish that number and it failed. DCI will only be awarded what it established it was owed.

7. Counterclaims

    a. Minority Shareholder Oppression

To establish shareholder oppression, a shareholder must establish that "those in control" of the closely-held corporation "acted oppressively" toward him. N.J.S.A. 14A:12-7(1)(c). Oppression has been found where the controlling shareholders awarded themselves excessive compensation, furnished inadequate dividends, misapplied and wasted corporate funds and where the fair expectations of the minority shareholder are not met due to his "rights or interests" as a shareholder being contravened by the wrongful acts of those in control. See Muellenberg v. Bikon Corp., 143 N.J. 168, 180 (1996).

However, the doctrine of acquiescence precludes shareholders from "sitting by or acquiescing in the wrongful conduct of the corporation" and then seeking a

remedy for that wrongful conduct long after the conduct occurred. <u>Casey v. Brennan</u>, 344 N.J. Super. 83, 118 (App. Div. 2001), aff'd, 173 N.J. 177 (2002).

If nothing else, this case has shown, again and again, why a knowing waiver of wrongful conduct cannot be conveniently withdrawn. Mr. Antebi claims that the other shareholders oppressed him by diverting funds to their other businesses, imposing large administration fees against DCI, charging inflated rent charges, and funneling money to fictitious charitable contributions. (Dkt. No. 66, at 33). But, the evidence showed that Mr. Antebi was aware of all of these alleged diversions. He admitted that he knew about the exorbitant rent charges and administration fees. (Tr. at 337-38). Evidence showed that Mr. Antebi was responsible for negotiating or re-negotiating the rent costs for DCI, which, after his efforts, resulted in an $84,000 rent charge for space that should have costed less than $5,000. (Tr. at 228; <u>see also</u> Defendant's Ex. I. at 2).

Even more troublesome, Mr. Antebi seems to insinuate that he knew that the inflated numbers were false and were entered so that Mr. Eddy could show a profit in DDD "for tax purposes." (Tr. at 338). Yet Mr. Antebi did nothing about what probably amounts to tax fraud. Apparently, using the company as a community ATM was too good a thing to disturb. It was only in response to DCI's claims against Mr. Antebi that he complained of oppression. But in doing so, he admits his complicity.

Just as DCI could not approve Mr. Antebi's use of DCI money for personal purchases for 4 years before complaining about it, Mr. Antebi could not sit by and

P-049

knowingly enjoy the fruits of this shady corporate scheme and then shout "minority oppression" after being called a thief. Mr. Antebi participated in every stage of the now-complained-about misappropriation. At very least, he knew it was going on.

His assertion of fraudulent charitable contributions suffers a similar fate. Mr. Antebi himself made numerous "charitable contributions" to Yeshiva that DCI claims were actually payments for his children's education. How can he now complain that others diverted funds to "charity" for their own purposes? All of these supposed charitable contributions may well find themselves the subject of a tax inquiry on the part of the donors *and* the recipients.

This Court finds that no wrongful act sufficient to constitute shareholder oppression since Mr. Antebi was complicit in each act. As such, this Court finds for DCI on the oppression claim.

b. Accounting

Not a single line in the trial transcript or post-trial brief directs the Court to any exhibits or testimony establishing the value of DCI. Since neither party has seen fit to so direct the Court's attention, the Court is under no obligation to do that for them by sifting through the vast volume of disorganized exhibits and deposition transcripts. All that can be said is that Mr. Antebi owes DCI for personal expenses in the amount of $240,676.03. That figure accounts for DCI's failure to prove that disputed expenses were in fact personal. It also accounts for Mr. Antebi's failure to

P-049

prove the amounts that he claims he accidentally misidentified as personal. Mr. Antebi is, however, entitled to offset the amount he owes against the $45,000 loan to the company. Therefore, Mr. Antebi owes $195,676.03 to DCI.[4]

IV. **Conclusion**

For the above reasons, this Court awards DCI $195,676.03 with pre-judgment interest. From the brazen fabrication of accounting numbers for "tax purposes" to the established practice of using corporate assets for everything from facilitating extra-marital affairs to helping interrelated companies show a profit on their books, this case suggests serious misconduct by the individuals at DCI. That neither party could establish either of their claims is a testament to how complicit each party was in the other's wrongdoing, to say nothing of the boldness of each in bringing these accusations in open court despite the distinct air of illegality.

SO ORDERED.

Dated: July 13, 2015  
Brooklyn, NY

s/Sterling Johnson, Jr.  
———————————————  
Sterling Johnson, Jr., U.S.D.J.

---

[4] As Mr. Antebi remains a 1/3 shareholder, he remains entitled to 1/3 of any dividends paid out by the company and upon dissolution, 1/3 of the profits of the company.

P-049